DELBERT J. RITTER and PAULINE RITTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ritter v. Commissioner
Docket No. 9325-77.
United States Tax Court
T.C. Memo 1979-12; 1979 Tax Ct. Memo LEXIS 513; 38 T.C.M. (CCH) 36; T.C.M. (RIA) 79012; January 8, 1979, Filed Delbert J. Ritter and Pauline Ritter, pro se. Richard A. Jones, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1973 and 1974 in the amounts of $ 1,819.28 and $ 1,879.94, respectively, and additions to tax under section 6653(a), I.R.C. 1954, [1] in the amounts of $ 90.96 and $ 93.99 for the years 1973 and 1974, respectively. The issues for decision are (1) whether, and if so the extent to which, Delbert J. Ritter understated his income from *514 tips in each of the years here in issue; and (2) whether respondent properly determined the addition to tax for negligence or intentional disregard of rules and regulations for each of the years here in issue. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, who resided in Las Vegas, Nevada at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1973 and 1974. Delbert J. Ritter (hereinafter referred to as petitioner) was hired as a waiter at the Casino de Paris Showroom (Showroom) of the Dunes Hotel and Country Club (Dunes) on August 21, 1964. He was still employed as a Showroom waiter at the Dunes at the time of trial of this case in June 1978. During the years 1973 and 1974, petitioner's paid hours worked at the Showroom totaled 1,644 and 1,700, respectively. During the years 1973 and 1974 petitioner, in his work as a waiter in the Dunes Showroom, received tip income in cash and also received tip income through the payroll department of the Dunes. The *515 tips he received through the payroll department of the Dunes were included in his checks and also included in his wages as reported by the Dunes on the Form W-2 provided to petitioner for each of the years here in issue. Petitioner did not report any of the cash tips he received to the Dunes during either of the years here in issue. The Dunes Showroom is a large room in which a floor show is presented twice nightly. One of the shows is a dinner show and at the second show drinks only are served. Some customers of the Showroom purchased prepaid tickets or came to the Showroom with a tour group. When tour groups were served, the tour group leader either purchased prepaid tickets for all members of the tour group, arranged with the Dunes to be billed for the members of the group or paid the cashier of the Showroom the evening the group came. In all instances of prepaid customers or tour group customers, regardless of the method of payment, the price of the ticket or the total price for the tour group included an amount representing a tip for the waiters or waitresses serving the ticket purchasers or the tour group. For this reason we will refer to the individual ticket purchaser *516 patron, as well as the tour group patrons, as the ticket patrons of the Showroom. The price of the food and drinks for ticket customers was below the lowest minimum entree price of dinner for the dinner show and the drink minimum for the second show. However, under the union contract which the Dunes had with the waiters and waitresses (hereinafter collectively referred to as waiters) for the years here in issue the portion of the ticket price allocated to tips on sales to ticket patrons could not be less than 15 percent of the lowest menu entree price for the dinner show or the minimum drink charges for the second show in effect at the time the tickets were used. As a result of this union requirement, the tips allocated on the dinner show in each of the years here in issue were $ 1.69 per ticket, and on the second show the tips were $ 1.28 and $ 1.35, respectively, for the years 1973 and 1974. For this reason the guaranteed tip to the waiters for the dinner show amounted to approximately 25 percent of the average amount included by the Dunes as ticket food sales in the year 1973 and 23 percent in 1974. For the late show, the guaranteed tip amounted to 28 percent of the average *517 per person amount of ticket sales included by the Dunes in its beverage revenue for the year 1973 and 30 percent in the year 1974. In 1973 and 1974, at least half of the Dunes Showroom customers were ticket purchasers. However, because of the ticket purchasers paying less for dinner and drinks than other patrons, the percentage of Showroom revenue from the ticket patrons would not be the same percentage of sales as the percentage of ticket patrons to total patrons. Some customers of the Showroom who were not ticket patrons paid their bills in cash and others paid by a credit charge card or by a charge on their bills for their rooms. In each of the years here in issue a number of the Dunes Showroom patrons were complimentary guests of the hotel. The majority of the complimentary guests were persons staying at the Dunes free of charge in order to encourage them to gamble at the Dunes. These persons were generally referred to as "junket comps." Some of the complimentary patrons were persons who had done extensive gambling in the Dunes hotel, resulting in substantial losses, and who had been offered a complimentary dinner and drinks at the Showroom by the Dunes management. The *518 complimentary patrons received favored treatment at the Showroom in terms of where they were seated and the service furnished to them. Although no charge was made to the complimentary patrons for food and drinks, the food and drink served to them were shown in the total sales of the Showroom on the books and records of the Dunes. The total amounts for sales to complimentary patrons included in the Dunes sales records were $ 1,207,656.52 for 1973 and $ 611,190.68 for 1974. The check handed to each complimentary patron at each show showed the food and drink to be complimentary but contained a stamp stating "Gratuity not included." The customer seating area at the Dunes is divided into a number of waiter stations for each show. For the dinner show waiters worked in teams of two at each station, and the two waiters shared their tips equally. There is only one waiter assigned to each station at the second show and therefore there is no tip-splitting for that show. One member of each team that worked the dinner show would work the second show so that each waiter worked the second show every other night of the days he worked. During the years 1973 and 1974 the number of Showroom *519 stations for the dinner show and second show ranged up to 18 or 20, with the number of seats in each station not less than 36. Some stations were preferable to others and therefore the Showroom stations were rotated among the waiters on a daily basis. Petitioner, during the years 1973 and 1974, was assigned an equal share of customers with other waiters. During the year 1973 the Showroom operated the dinner show 365 days and the second show 364 days. The total attendance at the Showroom during 1973 was 409,990, of which 188,796 attended the dinner show and 221,194 attended the second show. During 1974 each show was operated 361 days. The total attendance at the Showroom in 1974 was 398,020, of which 181,196 attended the dinner show and 216,824 attended the second show. The posted fire capacity for the Showroom for the years 1973 and 1974 was 542 persons for the dinner show and 650 for the second show. On some occasions, however, the actual seating in the Showroom exceeded the standard limits. Each waiter at the Dunes Showroom in 1973 and 1974 performed approximately the same percentage of paid setup and cleanup time to actual serving time. During the year 1973 and from *520 January 1, 1974 until August 1974, the tips from sales to ticket patrons who had either paid in advance or for whom the tour group leader paid the cashier the night the tour group came to the Showroom were paid to the waiters serving the ticket patrons in cash at the end of the waiters' working period in the Showroom. When ticket patrons were part of tour groups in instances where the group leader was billed later by the Dunes hotel, no amount of the tip was paid to the waiter in cash on the day he served the group. The tips on these sales were accounted for through the Dunes payroll department and each waiter's portion of the tips on such sales was paid to him as part of his regular payroll check.
Beginning in August 1974 all tips on sales to ticket patrons were accounted for through the payroll department with no amount of cash tip paid to the waiter the evening he served the ticket patrons. The amount of a waiter's proportionate share of the tip which was paid through the payroll department was included as part of his regular payroll check. During 1973 and until August 1974 the tips on approximately one-half of the sales to ticket patrons were paid in cash to the waiters and *521 were not included in the amounts reflected on the Dunes payroll records and therefore were not included as "wages, tips and other compensation" on the Forms W-2 provided the waiters by the Dunes at the end of each of the years 1973 and 1974. The tips on sales to ticket patrons of the Showroom which were reflected on the records of the Dunes payroll department and included on the Forms W-2 provided to the Showroom waiters totaled $ 148,257.90 and $ 211,121.96 for the years 1973 and 1974, respectively. The total paid hours worked by all waiters at the Showroom during the years 1973 and 1974 totaled 72,910.5 and 68,557, respectively. Waiters who served individual ticket patrons and small groups of ticket patrons received either in cash or through their pay checks the entire amount of the tip applicable to the patrons served. However, where service was to large tour groups of over 25 ticket patrons, or the total amount of dollar receipts from a group of ticket patrons was as large as that for such large groups, the Showroom captain received a portion of the tip applicable to the patrons so served. In cases of large groups, the waiters received from 73 to 86 percent of the guaranteed *522 tip. For 1973 and 1974 the guaranteed tips which petitioner received through his payroll checks from the Dunes Showroom were $ 2,677.62 and $ 5,552.54, respectively. All other tips received by petitioner in each of these years were received in cash. Where a customer had charged his purchases of food and drinks to a credit card or to his hotel room at the Dunes, the amount of tips shown on the charge was paid in cash to the waiter at the conclusion of his evening's work. In some instances a cash customer would leave no tip for petitioner. Also, in some instances, a complimentary customer would leave no tip for petitioner. During 1973 and 1974 petitioner would place his cash tips in a box he kept at home. Some time during the week petitioner would enter on a calendar he kept at home an amount of tips received, but petitioner destroyed these calendars at the end of the year. The following schedule shows the amounts entered in the records of the Dunes as Showroom sales, cabaret tax, sales tax and total: 1973
1974
Showroom Sales
(excluding taxes)
$ 4,014,262.54
$ 3,918,981.55
Cabaret Tax
359,346.86
323,208.87
Sales Tax
125,279.96
112,417.49
Total
$ 4,498,889.36
$ 4,354,607.91
*523 Respondent's agent, in investigating the records of the Dunes and the waiters and waitresses who worked there, reviewed the sales charged by individual patrons to their rooms at the Dunes for 52 different days scattered throughout the year 1973. Each of the charge sales used by respondent's agent, which he referred to as "front office charges," showed some amount of tip listed on the charge. The total front office charges, including tax for the 52 days reviewed by respondent's agent, in 1973 was $ 78,501.48. During the year 1974, respondent's agent reviewed 7 days of front office charges scattered throughout the year. The total of such charges, including tax for the 7 days, was $ 8,140.29. Respondent's agent separately added up the tips shown on the front office charges for the 52 days in 1973 and the 7 days in 1974 and computed a percentage of tips to total sales in 1973 of 15.8 percent and in 1974 of 16.1 percent. These percentages were on the basis of the total charges including tax. To determine total tip income of all waiters in the Showroom respondent's agent subtracted from total gross sales, including taxes, of the Showroom in each of the years 1973 and 1974, 25 *524 percent of the total amount to compensate for persons who left no tip, the fact that cash customers may tip less than charge customers and the fact that waiters vary in skill. The remaining 75 percent of the gross sales of the Showroom in each year was multiplied by 15.8 percent to obtain the total tips received by all waiters in the year. [2] The amount arrived at by multiplying 75 percent of total sales of the Showroom in each year by 15.8 percent was reduced by 16.67 percent to allow for tips distributed by waiters to busboys and bartenders. From the amount of such reduced tips, the amount of contract tips paid to the captains was subtracted to arrive at total tip income computed to be retained by all waiters. This total tip income computed to be retained by waiters was divided by the total paid hours worked by all waiters to arrive at an amount of cash tips per hour worked by waiters. The hourly amount computed on this basis was $ 6.67 in 1973 and $ 7.41 in 1974. [3]
*525 Respondent's agent computed the total amount of tips received by petitioner in each of the years 1973 and 1974 by multiplying the total hours he worked in each year by the computed average tip per hour received by all waiters in that year. Petitioners, on their joint Federal income tax return for 1973, included as tips received by petitioner $ 3,677.62, composed of $ 2,677.62 of tips included in payroll checks and $ 1,000 of cash tips. For the year 1974, petitioners reported on their joint Federal income tax return as tips received by petitioner the amount of $ 6,552.54, composed of $ 5,552.54 of tips included in payroll checks and $ 1,000 of cash tips. Respondent in his notice of deficiency determined that petitioner received total tip income of $ 10,965.48 and $ 13,278.36 for the taxable years 1973 and 1974, respectively, and on this basis determined that petitioner had understated tip income by $ 7,287.86 in 1973 and $ 6,725.82 in 1974.
OPINION Petitioners first contend that tips which were not included in petitioner's payroll checks are gifts and not compensation. On numerous occasions we have held that tips do constitute compensation for services rendered and are includable *526 in a taxpayer's gross income under section 61(a). Schroeder v. Commissioner, 40 T.C. 30, 33 (1963), and cases there cited. Petitioners next contend that if tips received in cash are considered income, it is up to respondent to prove the amount of tip income received by petitioner.Petitioners argue that the formula used by respondent based on averages is not proof of the amount of tip income petitioner received. This contention by petitioners is likewise erroneous. The record here shows that in 1973 and 1974 petitioner kept no books or records with respect to the tip income he received. Petitioner made some entries on calendars of some of the tips he received. Petitioner did not retain the calendars on which he made notations. However, if the $ 1,000 reported as cash tips in each year came from the notations on these calendars, the notations did not properly reflect the cash tips petitioner received. The record in this case shows, and petitioner in fact admits that it shows, that only about half of the tips he received from ticket patrons were included in his payroll checks for the period January 1, 1973 until August 1974. Therefore, clearly cash tips received *527 from ticket patrons by petitioner in 1973 and 1974 were greatly in excess of the $ 1,000 cash tips reported by petitioner for each of these years. Petitioner admits that in addition to cash tips from ticket patrons, he received cash tips from customers who paid by cash, by charging their purchases to a credit card or by charging to their rooms at the Dunes. Also, he received some cash tips from complimentary customers. Where a taxpayer keeps no record, or the records kept by the taxpayer are so inadequate or erroneous that they do not clearly reflect income, respondent is authorized under the provisions of section 446 to compute the taxpayer's taxable income under such method as in his opinion does clearly reflect income. Where a taxpayer had kept no records or inadequate records of tip income, use of a method for computing such taxpayer's tip income similar to that used by respondent in this case has been approved by this and other courts. See Mendelson v. Commissioner, 305 F.2d 519 (7th Cir. 1962), affirming a Memorandum Opinion of this Court. Finally, petitioner contends that regardless of the accuracy of respondent's computation with respect to receipts *528 by waiters on the average, the amount so computed for his tips is inaccurate. Petitioner, however, admits that he did as well with respect to persons served as other waiters. [4]
In our view, respondent's computation of total tip income received by petitioner for the year 1973, as corrected in Footnote 3, supra, is most reasonable. The computation of petitioner's total tip income for 1973 is $ *529 9,568.08 (1,644 x $ 5.82). Petitioner estimated that he served about the average number of ticket patrons as were served by other waiters. Ticket patrons were about 50 percent of all customers in 1973. If it is assumed that in fact the ticket patrons served by petitioner were 50 percent of the patrons he served in 1973, the result of respondent's computation as corrected in 1973 would be that he received over $ 1,100 less in that year as tips from cash, charge and complimentary patrons than he did from the same number of ticket patrons. [5] On the basis of this record as a whole, we sustain respondent's computation as corrected of petitioner's tip income for 1973 and hold that petitioner received total tip income in 1973 of $ 9,568.08. Respondent's computation for 1974 is essentially the same as for 1973 except that he used percentage of tips to sales from front office charges for 1973 to apply to 1974.Respondent recognized that the 7 days used as *530 a sample of front office charges in 1974 was an inadequate sample. Since the 7-day period came out to 16.1 percent tips to sales as compared to a ratio of 15.8 percent for 1973, respondent argues that his use of the 1973 percentage is favorable to petitioner.
If nothing better appeared in the record, we would be inclined to accept respondent's 1974 computation as the best evidence available and conclude that any error against petitioner was of his own making for failure to keep adequate records. However, we do not conclude, as does respondent, that because the computation for 7 days showed a 16.1 percent tip ratio an adequate sample would have shown this amount or the 15.8 percent ratio derived in 1973. Prices were slightly higher in 1974 for certain items as shown by the increase in the tip on the minimum charge for the second show for sales to ticket patrons where a tip of 15 percent of the minimum was required. Also, the record indicates that the average price paid by ticket patrons for the dinner show was somewhat higher in 1974 than in 1973, but apparently the lowest entree menu price in effect for the dinner show was the same in 1973 and 1974 since the tip for that show *531 for ticket patrons remained the same. The tips received by waiters for the dinner show from ticket patrons averaged 25 percent of such sales in 1973 and 23 percent in 1974. Total attendance and total sales were somewhat less in 1974 than 1973. With respect to tips, this reduced attendance was compensated for by the fact that total hours worked by all waiters decreased from 72,910.5 to 68,557 in 1974. The record shows that the dinner show operated 365 days in 1973 and the second show 364 days, whereas each of these shows only operated 361 days in 1974. Dividing the 72,910.5 hours worked by all waiters in 1973 by 365 days results in approximately 200 hours of work by all waiters each day of operation of the Showroom in 1973. Therefore, over 700 of the fewer hours worked by all waiters in 1974 would be accounted for by the fewer days of operation. Considering this record as a whole, the overall indication is that a waiter in 1974 would receive approximately the same tips per hour as he received in 1973 or perhaps slightly higher tips per hour in 1974 on ticket patrons. Therefore, in our view the most reasonable way on this record to compute petitioner's tips for 1974 is to *532 multiply the hourly rate of tips he was computed to have received in 1973 of $ 5.82 by the 1,700 hours he worked in 1974. The result of such a computation is total tips received in 1974 of $ 9,894. When the total tips reported by petitioner in 1974 of $ 6,552.54 is subtracted from this figure, his resultant understatement of tip income for 1974 is $ 3,341.46. We therefore hold that petitioner understated his tip income for 1973 in the amount of $ 5,890.46, and understated his tip income in 1974 by the amount of $ 3,341.46. Petitioner has made no showing of error in respondent's determination of the addition to tax under section 6653(a). In fact, the record shows that petitioner was negligent in failing to keep accurate records of his tip income. We therefore sustain respondent's determination of an addition to tax under section 6653(a) in each of the years here in issue. Decision will be entered under Rule 155. Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Respondent's agent testified that the higher tip percentage computed on the basis of 7 days in 1974 was not used since he did not consider the 7 days to be a representative sample. ↩
3. Respondent actually used $ 7.81 per hour of tips for petitioner in 1974 apparently because of a mistake in his hours worked since he worked some overtime hours. The figures of $ 6.67 for 1973 and $ 7.41 for 1974 are those used by respondent in his notice of deficiency and which the agent testified were the result of the computation as outlined in the opinion. Using the figures and computation as testified to by respondent's agent, we arrive at an amount of $ 5.82 for 1973 and $ 5.95 for 1974, computed as follows: [SEE TABLE IN ORIGINAL] Therefore the total amount of tips received by petitioner mathematically properly computed under the formula worked out by the revenue agent and used as the basis of the notice of deficiency should have been $ 9,568.08 for 1973 and $ 10,115 for 1974.↩
4. Petitioner also argues that since most of the waiters of the Dunes Showroom settled their cases with respondent for less than the amount computed under the formula used by respondent, a lesser amount should be used in his case. The record does not show whether other waiters settled their cases with respondent or the basis of such settlements. Petitioner's argument in this respect at the hearing is not evidence. However, even if the record did show settlements made between respondent and other waiters, this fact would be totally immaterial to the determination in petitioner's case. All this would show would be that, for undisclosed reasons, waiters and respondent agreed to the amount of the tax liability of those waiters, which would have no relevance to petitioner's case.↩
5. This is computed as follows: $ 2,677.62 of tips in payroll checks plus $ 2,677.62 cash tips from ticket patrons equals $ 5,355.24. $ 9,568.08 minus $ 5,355.24 equals $ 4,212.84. $ 5,355.24 minus $ 4,212.84 equals $ 1,142.40.↩