PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————

No. 96-3603

———————————

Tax Court Docket Nos. 32434-88, 32435-88

J.J. ZAND and EVA ZAND,

                                        Petitioners-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE SERVICE,

                                        Respondent-Appellee.

———————————

Appeals from a Decision of the
United States Tax Court

———————————

**(June 15, 1998)**

Before BLACK, Circuit Judge, and HILL and HENDERSON, Senior
Circuit Judges.

HILL, Senior Circuit Judge:

J. J. Zand and his wife, Eva C. Zand,[1] appeal from a 272-page Tax Court decision[2] issued by Judge Howard Dawson in 1996, regarding a ten-day trial presided over by Judge Meade Whitaker five years earlier. The tax years involved in their two consolidated cases date back to 1972-1981. The sole issue for our review is whether the Tax Court violated the taxpayers' rights to due process and to a fair trial, and committed clear error, by reassigning their cases to successor Judge Dawson to write the opinion after presiding Judge Whitaker retired on permanent disability.[3]

Upon a careful review of the record, we conclude that the taxpayers waived their right to a new trial, both by failing to request one, and by indicating that a new trial would cause them hardship. As the taxpayers' constitutional rights were not violated, we affirm the judgment of the Tax Court.

---

[1] Collectively, Mr. and Mrs. Zand will be referred to as "taxpayers." They received statutory notices of deficiency in income taxes from the Commissioner of Internal Revenue (Commissioner) for the years 1978 through 1981. Singularly, Mr. Zand will be referred to as "Zand." He received statutory notices of deficiency for the years 1972 through 1977.

[2] The Tax Court decision determined income tax deficiencies against Zand of $9,030,576.98, together with fraud ($4,250,615.33) and negligence ($63,821.68) penalties for 1972-1977. It determined income tax deficiencies against taxpayers for the years 1978-1981 of $987,579.00, together with a negligence penalty of $49,378.95.

[3] We affirm without opinion the two remaining issues presented, which are: (1) whether the Tax Court correctly found that Zand, individually, earned certain unreported income, and not various other entities; and (2) correctly imposed the addition to tax for fraud penalty under Internal Revenue Code § 6653(b) for the years 1972-1976. *See* 11th Cir. R. 36-1.

## I. FACTUAL AND PROCEDURAL BACKGROUND[4]

Zand was born in Iran in 1923. In 1953, he became a United States citizen. By the mid-1950's, Zand had already begun a long and seemingly successful career as an international entrepreneur. In 1958, Zand, together with his father and a classmate, formed the Diesel Power Trading Company (Diesel Power) in Iran. By 1972, Zand had acquired 100% of Diesel Power.[5] Over the years, many business relationships were formed and transactions made among Zand, Diesel Power, and the Caspian Trading Company (CTC), Zand's sole proprietorship[6] and various American manufacturers (such as Lockheed Aircraft Corporation, Ashland Bermuda Limited, General Motors, and Ingersoll-Rand Company). Business transactions typically involved the provision of services by Zand and/or his companies to the American manufacturer, generating commission income to Zand and stimulating the sales of American manufactured goods abroad, principally to Iran.

---

[4] We present only a cryptic factual background pertinent to the due process issue addressed in this opinion. For further factual background, we direct the reader to Judge Dawson's lengthy memorandum opinion, unofficially reported at *Zand v. Commissioner,* 71 T.C.M (CCH) 1758 (1996).

[5] In October 1974, he sold fifty-one percent to his sister and brother-in-law. He sold the remainder in 1977.

[6] In the early years, the CTC acted as a liaison between the Caspian Trading Company of Iran (Caspian Iran), in which Zand had no interest, and certain American manufacturers with which Zand had a business relationship. Caspian Iran imported American equipment into Iran and was the Iranian distributor of American products in Iran. Zand severed his ties with Caspian Iran in 1957.

The Commissioner of Internal Revenue (Commissioner) audited Zand's tax returns for the years at issue, asserted fraud and negligence penalties, questioning who earned certain commissions from various manufacturers and the deductibility of numerous business expenses. The result of the Commissioner's audit was that Zand failed to report millions of dollars of commission income and that his alleged failure to do so was fraudulent. She originally issued statutory notices of deficiency of $11,634,023.28, together with fraud ($4,660,681.33) and negligence ($89,987.40) penalties.[7] The taxpayers filed petitions in the Tax Court, seeking a redetermination of their income tax liabilities.

The cases were assigned to Judge Whitaker in October 1989 for trial or other disposition. After extensive discovery by both parties, the cases were tried in August 1991. The trial lasted ten days. Zand and twenty-one other witnesses testified during his case in chief. The Commissioner called ten witnesses. At the conclusion of the trial, Judge Whitaker made the following statements from the bench:

> What I particularly want both sides to do – and I think this is of more concern to you Mr. Curtin [taxpayers' counsel], than Ms. Herbert [Commissioner's counsel] – maybe I should preface this by saying that it is my recollection of the testimony, and this is not a decision on my part, but my present recollection of the way the testimony came before me, Mr. Curtin, you made a very strong case for your client.

---

[7] The Commissioner, in her amended answer, increased the deficiencies and fraud penalties by $470,149.90, and $235,074.95, respectively.

4

I don't mean any criticism of Ms. Herbert, but I think your witnesses all supported your client's position, and frankly I don't think Ms. Herbert's witnesses did any appreciable damage. And again, this is purely from recollection.

. . . .

Ms. Herbert, as I indicated, I think [taxpayers'] case is a very strong case. . . .

. . . .

And if I were you [Ms. Herbert], I wouldn't waste a whole lot of time on that argument [of fraud]. I don't think this is a fraud case, frankly. Understand again, this is just my reaction today after listening to two weeks and one day of testimony, but I don't believe you've proved fraud . . . .

. . . .

You're perfectly – obviously, you can argue it [fraud]. You should argue it. But point out those parts of the record which you think support fraud, because I have some trouble with it. I don't think this ought to have been a fraud case to start with.

Final briefs were filed in June 1993. Judge Whitaker had not disposed of the cases when he retired on permanent disability in January 1995.

In February 1995, Chief Judge Hamblen issued the following order:

Judge Meade Whitaker, to whom these cases are submitted is fully retired as of January 31, 1995. The Court proposes to reassign these cases to another Judge of this Court for purposes of preparing the opinion in these consolidated cases. Upon due consideration, it is

ORDERED that the parties on or before March 3, 1995, file with the Court a response, if any, to such reassignment. The Court will thereupon take such action as it deems appropriate.

The Commissioner agreed to the reassignment.[7] Taxpayers filed their response,

requesting a status conference with the Chief Judge, yet stating that they were not in

a position to make an informed decision on the Court's proposal to reassign.[8]

---

[7] The Commissioner stated that:

[T]he [Commissioner] agrees with the Court's proposal to assign these cases to
another Judge of the Court for opinion . . . . [I]n the event that the Court, or the
Judge to whom the cases are assigned, wishes to consider that judicial action after
reassignment would encompass further actions other than preparation of the
opinion, the [Commissioner] requests an opportunity to provide her views on any
expanded scope of consideration.

[8] The taxpayers stated that they were:

[C]urrently engaged in the process of evaluating the legal implications,
consequences, possible alternatives and potential prejudicial impact of the court's
proposal to reassign these cases to a judge who did not preside over the
comparatively long and heavily factual trial of this case. The retirement of Judge
Whitaker and the potential reassignment to a new judge at this point in these cases
are unexpected and unusual events that must be carefully and fully evaluated to
ensure that the taxpayers are given every opportunity to understand what has
happened and what their rights are. The [taxpayers] need additional time and
information before they can make final and informed decisions on the matters
raised in the February Order [proposing reassignment].
    In order to assist [taxpayers] in deciding whether to object or not to the
reassignment proposed in the aforementioned Order and to assist them in
evaluating possible alternative solutions to the unwelcome dilemma that now
surrounds them, [taxpayers] believe that the interests of justice require that a
status conference be scheduled with the Chief Judge before any action is taken on
these cases. . . . In [taxpayers'] view, such a conference serves the interests of
justice and is consistent with appropriate case management principles. At this
conference counsel would be prepared to discuss and seek guidance on the
proposed reassignment, including its scope and legal implications, as well as
alternative approaches, if any, that may assist in protecting the taxpayers from the
substantial prejudicial impact of the loss of the judge who tried the case as the
decision maker in this very factual case . . . .

6

In Part III of the taxpayers' response, entitled "The Taxpayers' Dilemma"[9] they

stated:

> As will be explained in more detail during the status conference, if the Court grants our request, *the expense of the trial of this case four years ago, the passage of time since the trial, and the occurrence of a number of events since the trial, have combined to put Mr. Zand in a position where he cannot financially afford to retry this case.* The first trial was a financial blow to the taxpayers. Following the expense and effort of trying this case, Mr. Zand's finances quickly worsened. First, he lost his business to a lender. Then, he and his family lost their home to a foreclosing bank. Unsurprisingly, Mr. Zand's finances have been sapped by this matter since the audit that ultimately led to this litigation started in the late 1970s.
> *The effort and expense of putting on the same case presented four years ago would be very difficult to duplicate.* Mr. Zand called 20 witnesses in his case-in-chief, some of them from other countries and others from distant locations within the United States. *Moreover, Mr. Zand is now 72 years old* [in 1995] *and certainly not in the same health he was in 1991 when he was able to attend every minute of the trial and testified for hours on direct and cross-examination. Under the unique circumstances presented here, no taxpayer should be asked or required to retry a case of this magnitude.* Additionally, no taxpayer should be deprived of the right to have a case of this size and factual character decided by the judge who heard it. The [taxpayers] did not bring this dilemma on themselves and they should not be penalized or prejudiced by it.

(Emphasis added.)

In March 1995, Chief Judge Hamblen issued an order directing counsel for the

parties to appear for a status conference on April 5, 1995. In hindsight, and,

---

[9] From a trial strategy standpoint, the depth of taxpayers' dilemma goes even further. Judge Whitaker's comments from the bench apparently gave the taxpayers every cause to believe they would be victorious, at least on the fraud issue.

unfortunately for all concerned, the April 5, 1995, status conference was not stenographically reported or otherwise recorded.[10] It was attended by Chief Judge Hamblen, Judge Dawson, and counsel for the respective parties. The Commissioner's recollection of events is that the Chief Judge explained the three options available: (1) retrial before another judge if requested by either party; (2) reassignment of the cases to another judge for disposition on the existing record; or (3) settlement. Commissioner claims that neither party requested a new trial at the status conference. She suggested that the taxpayers submit an offer-in-compromise.[11] This recollection appears to align with that of Judge Dawson who writes: "At an informal conference with counsel for the parties on Apr. 5, 1995, the parties were offered a new trial, which was not accepted, and it was suggested that efforts be made to settle the cases." *Zand v. Commissioner,* 71 T.C.M. (CCH) 1758, 1764 n.1(1996).

Taxpayers, on the other hand, claim that the focus of the status conference was settlement, not retrial or reassignment. They claim in their brief that:

---

[10] Informal status conferences, however, are not required to be stenographically reported or otherwise recorded. *See* Tax Ct. R. 150. In the record on appeal, the closest memorialization of the events which transpired at the April 5, 1995, status conference appears to be the Commissioner's [undated] memorandum to the file, which appears as the fifth document attached to the taxpayers' "Motion For Production of the Record of Proceedings of the April 5, 1995 Conference with the Court."

[11] The record reflects that the taxpayers, citing financial difficulties, and a net worth of approximately $1.5 million, offered the Commissioner $250,000 to settle their cases. Their offer was rejected. By this time [1995], proposed taxes and penalties approached $20 million.

8

> [A]t the status conference, the Tax Court briefly outlined possible solutions available to the parties and the Tax Court, including particularly settlement. *The Tax Court stated that it preferred that the parties settle the case so that the Tax Court would not have to expend further time and judicial resources on the case. The discussion then focused on the best way of exploring the possibility of settlement.*

(Emphasis added.)

In October 1995, following the parties' failure to settle, *see* note 11 *supra*, Chief Judge Hamblen assigned the cases to Judge Dawson.[12] In November 1995, taxpayers filed an objection to the reassignment of the cases but again did not request a new trial. In January 1996, Judge Dawson issued his opinion. He ultimately found that Zand: (1) had substantially understated his taxable income for the years 1972 through 1977; (2) had substantially overstated his business expenses and deductions for the years 1973 through 1981; and (3) had made such omissions and overstatements with fraudulent and negligent intent. Roughly, the opinion reflects an approximate finding of 80% for the Commissioner and 20% for the taxpayers.

In March 1996, taxpayers filed a motion for reconsideration. In its order denying taxpayers' motion, the court stated:

> A very disturbing statement is made in the motion by [taxpayers'] counsel that the "parties were not offered a new trial" at the chambers conference, requested by them, on April 5, 1995. *That statement is*

_____

[12] Although Judge Dawson had read the briefs (at the Chief Judge's request), there was no implication at the April 5, 1995, status conference that the cases would go to Judge Dawson if reassigned.

*conspicuously incorrect and contrary to fact.* At the April 5, 1995, conference Chief Judge Hamblen informed counsel that Judge Whitaker had retired on permanent disability and that he could not be recalled to prepare an opinion deciding the issues in these cases. Chief Judge Hamblen clearly explained that three options existed [retrial, reassignment, settlement]. *Because the parties were offered, and declined, a new or further trial, that option was eliminated. The right to a new or further trial was waived by both parties. . . .* [Taxpayers] now seek either an opinion and decision by Judge Whitaker, which of course is not possible, or a decision totally in their favor, based predominantly on the testimonial evidence to the exclusion of the voluminous documentary evidence, which we are unwilling to give them . . . .

(Emphasis added.)

In May 1996, taxpayers filed a motion to dismiss their cases upon the ground that they had been denied procedural due process. In its order of denial, the Tax Court stated:

We emphasize again that both parties were told by then Chief Judge Hamblen at the April 5, 1995, informal status conference, requested by [taxpayers'] counsel, that the Court would grant a new or further trial of these cases if requested by either party. Both Judge Hamblen and Judge Dawson are certain that Mr. Curtin stated that [taxpayers] were unwilling to retry the cases, primarily because of the age, health, and financial condition of [Zand]. . . . *It is the Court's view that the parties were offered a new trial and they did not accept it. Therefore, we think the right to a new trial was waived. To this day* [June 12, 1996] *the Court has not received any request, formal or informal, or any motion for a new trial from either party. . . .*

. . . .

Because of Judge Whitaker's physical ailments it was not possible for him to decide these cases before it became necessary to retire on permanent disability. . . . It strikes the Court as incongruous that [taxpayers], who apparently were aware of Judge Whitaker's health problems, have leveled their criticism of him for delay in the opinion

10

process, while contending, at the same time, that only Judge Whitaker can fairly decide these cases.

(Emphasis added.)

Thereafter, in June 1996, the taxpayers moved that the Tax Court provide them with any record that might exist of the April 5, 1995, status conference. In its denial, the court stated:

> The conference was informal. . . . There was no official stenographic reporting of the . . . informal status conference. It was not a hearing or a trial. Any unofficial, internal Court documents, including memorandums or notes by Judges or employees, that may exist are, of course, confidential and not subject to production. . . . *In short, [taxpayers] have never requested or moved for a new trial of these cases. Apparently they are now attempting to put themselves in a position where they can disavow their previous declination. The plain fact of the matter is that they declined to retry these cases.*

(Emphasis added.)[13]

In September 1996, taxpayers filed a motion to vacate the decisions and for a new trial. It was denied. The taxpayers now appeal Judge Dawson's January 1996 opinion.

---

[13] The Court, in an opinion co-signed by the Chief Judge, went on to sternly admonish counsel for the taxpayers for making allegations regarding "the Court's candor and credibility which are inconsistent with what occurred. . . . Mr. Curtin [taxpayers' counsel] related at the conference that a new trial was not a viable option and was not sought. . . . Correlatively, we note that Mr. Curtin is not a signatory to any of the post-opinion motions which attack the Court's credibility and denigrate its integrity. We do not take these aspersions lightly. Thus, any further action in this respect will be treated as frivolous, invidious, and for purposes of vexatious delay that could result in the imposition of appropriate sanctions."

## II. ISSUE ON APPEAL

Whether, after determining that taxpayers had declined its offer of a new trial, the Tax Court violated the taxpayers' rights to due process and to a fair trial, and in so doing, committed clear error when it reassigned their cases to a successor judge to write the opinion after the presiding trial judge retired on permanent disability.

## III. STANDARD OF REVIEW

The Tax Court's findings of fact are subject to reversal only if clearly erroneous. *Commissioner v. Duberstein,* 363 U. S. 278, 291 (1960); *Florida Hosp. Trust Fund v. Commissioner,* 71 F.3d 808, 810 (11th Cir. 1996). Whether taxpayers waived their right to a new trial is a question of fact. *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

## IV. DISCUSSION

A. *The Contentions of the Parties*

1. *The Taxpayers*

The thrust of the taxpayers' argument is that Judge Whitaker, from the bench at the close of trial, made oral findings of fact, especially relating to witness credibility and fraud, and those findings constitute the law of the case. Tax Ct. R. 152(a). They claim that, as Judge Whitaker heard the testimony of Zand and his witnesses, and observed first hand their demeanor on the witness stand, Judge Dawson committed

reversible error when he gave no due deference to Judge Whitaker's findings. Taxpayers claim that, in rejecting these findings, Judge Dawson found them to be inappropriate statements, approaching injudicious or prejudicial. In this implicit rejection of the trial's testimonial evidence, taxpayers assert that Judge Dawson also committed reversible error by deeming their witnesses not to be credible, not only as to the issue of fraud, but also as to issues concerning the deductibility of expenses, the earning of commission income, and the asserted negligence penalty. *See Exxon Corp. v. United States,* 931 F.2d 874, 878 (Fed. Cir. 1991)(a successor judge has no authority to amend his predecessor's findings if they are dependent upon weighing conflicting testimony and evaluating witness credibility); *Henry A. Knott Co. v. Chesapeake & Potomac Tel. Co.,* 772 F.2d 78, 85 (4th Cir. 1985)(deference should be given to the trier of fact as the person who sees the witness and hears the testimony); *Toussaint v. Commissioner,* 743 F.2d 309, 312 (5th Cir. 1984)("[d]ue regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. . . ."). Taxpayers claim that Judge Dawson compounded this error when he drew negative inferences from various documents against Zand and his witnesses, all without regard to their trial testimony or Judge Whitaker's view that their testimony was credible.

13

The taxpayers contend that they did not consent to the reassignment. *Emerson Elec. Co. v. General Elec. Co.,* 846 F.2d 1324, 1326 (11th Cir. 1988). They claim that a close scrutiny of the record shows that Zand never declined an offer of a new trial. Once settlement discussions came to an end, the taxpayers argue that the Tax Court gave them no opportunity to request a new trial. They claim to be blind-sided by the court's opinion finding that Zand waived his right to a retrial after the April 5, 1996, status conference and continue to dispute what transpired at the unrecorded status conference.

### 2. *The Commissioner*

The Commissioner contends (contrary to taxpayers' claim that the Tax Court never offered the parties a new trial and that the taxpayers never declined a new trial), that Chief Judge Hamblen, at the April 5, 1995, status conference, explained that a new trial was one of the three options [in addition to reassignment or settlement] available to the parties after Judge Whitaker retired. She agrees with Judge Dawson's statement that taxpayers' claim that the parties were not offered a new trial is "conspicuously incorrect and contrary to fact."

In addition, the Commissioner claims that the taxpayers waived their right to a new trial even before the status conference was held, by stating (in their pleading requesting a conference), that the cost of the earlier trial and subsequent financial

14

reverses had left taxpayer "in a position where he cannot financially afford to retry this case" and that he was four years older and not in the same health as he had been at the time of the trial.

Further, the Commissioner claims that Judge Whitaker's oral statements from the bench were not his findings of fact. She contends that oral findings would have been inappropriate as the relevant facts and law of the case were not clear at the close of evidence and briefs had not been filed. *See* Tax Ct. R. 152. She argues further that Judge Whitaker's comments were not binding, even as to fraud, because they were substantially qualified ("this is not a decision on my part" . . . "this is just my reaction today"). The Commissioner claims that Judge Dawson was "well aware" of these comments which he described as a "tentative and qualified reaction by the trial judge made before a review of all the testimony and massive documentary evidence and before any briefs were filed." Hence, Judge Whitaker's comments, the Commissioner avers, were of a preliminary or tentative nature, not embodied in a ruling, and not binding.

The Commissioner cites *Milbrew, Inc. v. Commissioner,* 710 F.2d 1302 (7th Cir. 1983) in support of her position. In *Milbrew,* the taxpayer's case was decided by a successor judge after reassignment by the Tax Court. In its affirming opinion, the Seventh Circuit rejected the taxpayer's attack upon the reassignment by stating:

15

The Tax Court judge before whom the case was tried retired after the trial but before rendering his opinion. The taxpayers agreed that the case could be reassigned to another judge for decision on the record compiled before the first judge, and this was done. *Having been willing to take their chances before the second judge they cannot complain because he decided the case against them. The first judge had made comments during the course of the trial that were very favorable to the taxpayers. The taxpayers were confident that his successor would be influenced by those comments and would decide for them. They were disappointed. Of course if he had decided for them they would be defending vigorously the procedure that was adopted. By consenting to the procedure they waived any objection.*

(Emphasis added.)

*Milbrew,* 710 F.2d at 1308; *see also W.R.B. Corp. v. Geer,* 313 F.2d 750 (5th Cir. 1963). The *Milbrew* taxpayers consented to the reassignment procedure. The Seventh Circuit concluded that they had waived any objection to that procedure and affirmed the judgment of the Tax Court.

B. *In General*

Fed. R. Civ. P. 63[14] provides:

---

[14] Before it was amended, Rule 63 read as follows:

Disability of a Judge

If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after . . . findings of fact and conclusion of law are filed, then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.

16

Inability of a Judge to Proceed

If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties. In a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also call any other witness.

---

The original text contained restrictions that contemplated withdrawal of a judge only after completion of the trial, and only by reason of death, sickness, or disability. 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2921. The 1991 amendments to Rule 63 broadened its scope considerably. *Id.* Before it was amended in 1991, Rule 63 applied only "after . . . findings of fact and conclusions [were] filed" in a non-jury case. *Id.* After amendment, a provision was added allowing judges to withdraw for reasons other than death, sickness, or disability. *Id.* In addition, the rule now provides that a judge may withdraw at any time after a trial or hearing is commenced; the trial need not be completed for a substitute judge to be assigned. *Id.* The Advisory Committee Notes indicate that this change was made in view of the "increasing length of federal trials," "to prevent unnecessary expenses and delay." *Id.; see also Canseco v. United States,* 97 F.3d 1224, 1226 (9th Cir. 1996)(citing Advisory Committee Notes to 1991 Amendment to Fed. R. Civ. P. 63).

    Insofar as the factual circumstances of this case are concerned, all parties agree that the amendment works no change.

Although the Tax Court rules contain no parallel rule, the practice is substantially the same in the Tax Court.[15]  *See* Tax Ct. R. 1; *Townsend v. Gray Line Bus Co.,* 767 F.2d 11, 17-18 (1st Cir. 1985).

And, although Rule 63 was amended in 1991 and considerably broadened, the present rule encompasses the former rule and more.  *See* note14 *supra.*  We therefore look to pre-1991 decisions for guidance given the facts of this case.

Under pre-1991 Rule 63, if the judge became disabled after filing his findings of fact and conclusions of law in a civil bench trial, the successor judge could substitute for the original judge and complete any duties remaining in the case without holding a new trial.  *Home Placement Service, Inc. v. Providence Journal Co.,* 819 F.2d 1199, 1202 (1st Cir. 1987).  The rule empowered the successor judge to grant a new trial if the remaining duties would not otherwise be satisfactorily performed.  *Id.* The decision as to whether to hold a new trial was left to the discretion of the successor judge.  *Id.*  We conclude, after carefully reviewing the trial transcript, that

---

[15] Here, in its order denying the taxpayers' post-opinion motion to dismiss, the Tax Court stated:

> Although the Tax Court Rules of Practice and Procedure do not contain a rule similar to Fed. R. Civ. P. 63, this Court has followed the spirit of Rule 63 and used it to provide us with guidance.  It has been our practice to grant a new or further trial, if requested by either party, when a judge who heard the case dies, becomes disabled, or resigns before preparing the findings of fact and opinion. However, if no such request is made, or if a new trial is offered and not accepted, the Court will reassign the case, even over the objection of a party, to another judge for disposition on the record made before the trial judge.

18

Judge Whitaker's comments were not findings of fact binding on Judge Dawson. Therefore historically, Rule 63 did not explicitly apply to the circumstance present here, that is, where the presiding judge in a bench trial became disabled before he filed his findings of fact and conclusions of law. The application of the rule, however, is made implicitly, by negative inference. *See Townsend,* 767 F.2d at 17-18. Courts found that if the presiding judge in a civil case became disabled (or died) before issuing his findings of fact and conclusions of law, the successor judge was required to retry the case. *Id.; see Whalen v. Ford Motor Credit Co.*, 684 F.2d 272 (4th Cir.)(en banc), *cert. denied*, 103 S.Ct. 216 (1982); *Thompson v. Sawyer*, 678 F.2d 257 (D.C. Cir. 1982); *In re Schoenfield*, 608 F.2d 930, 934 (2d Cir. 1979); *Arrow-Hart, Inc. v. Philip Carey Co.*, 552 F.2d 711, 712-13 (6th Cir. 1977). An exception to the rule mandating a retrial was made only if all parties agreed to allow the successor judge, in a non-jury action, make findings of fact and conclusions of law based upon a prior, or stipulated record. *Townsend*, 767 F.2d at 17-18 (citing *Milbrew*, 710 F.2d at 1308); *Whalen*, 684 F.2d at 278; *Thompson*, 678 F.2d at 268-69; *Arrow-Hart, Inc.*, 552 F.2d at 712-13. This circuit followed suit. *Emerson Elec.*, 846 F.2d at 1326 ("When a judge has yet to make findings of fact and conclusions of law, a successor judge must retry the case unless (1) all parties consent to resolution based on the trial transcript

19

or (2) summary judgment would be appropriate . . . ."); *see also Mesa Petroleum Co. v. Coniglio*, 787 F.2d 1484, 1488 (11th Cir. 1986), *cert. denied*, 107 S.Ct. 876 (1987).

Taxpayers claim the consent exception is not applicable here. They seek to distinguish their case from the *Townsend* line of cases on the ground that they did not consent to the reassignment of these cases to Judge Dawson. *Townsend*, however, is very much on point. 767 F.2d at 17-18.

In *Townsend*, the First Circuit was sympathetic with Gray Line Bus Company, the appellant, as constitutional considerations, as well as the implication of Rule 63, would ordinarily accord litigants such as Gray Line a new trial where the previous judge had died or become disabled before filing his findings and rulings. However, Gray Line's own conduct caused the court's sympathy to rapidly dissipate:

> Thus, but for the conduct of Gray Line, the case should have been retried. Here, however, we are satisfied that Gray Line waived its right to a new trial by failing to appear at the status conference, by failing to respond when Townsend's counsel later notified it that the court would likely proceed on the basis of the old record, and by neglecting to respond or communicate with the court in any way during the relevant period.

*Townsend,* 767 F.2d at 18.

Although taxpayers' actions here are not negligent actions as those in *Townsend,* the same principle applies. Taxpayers' mere objection to the reassignment, a reaction, was not accompanied by the necessary concomitant action, that is, a

20

request for a new trial. Here, not only did taxpayers not request a new trial, they indicated to the court all the reasons they did not want a new trial, and that a new trial would cause them undue hardship. By cleverly tiptoeing across this procedural tightrope, taxpayers tried carefully to avoid consenting to a reassignment, while at the same time, carefully to avoid asking for a new trial, thus paralyzing the court's ability to proceed at all. As we have outlined, Rule 63 anticipates and circumvents this paralysis.

## V. CONCLUSION

The Tax Court's finding that taxpayers waived their right to a new trial or a further trial is, from this record, clearly correct, not clearly erroneous. As in *Milbrew*, the taxpayers cannot now complain simply because Judge Dawson decided the case against them. The judgment of the Tax Court is

AFFIRMED.