James L. TOWNSEND, Plaintiff,

v.

GREY LINE BUS CO., a/k/a the Gray Line Inc., Defendants.

Civ. A. No. 77–1931–C.

United States District Court,
D. Massachusetts.

Nov. 27, 1984.

Order Amending Dec. 28, 1984.

Richard L. Neumeier, Parker, Coulter, Daley & White, Boston, Mass., for plaintiff.

Alan P. Caplan, George O'Brien, Boston, Mass., for defendants.

## OPINION

CAFFREY, Chief Judge.

This is an employment discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1870, 42 U.S.C. § 1981. Plaintiff, James L. Townsend, who is black, alleges that defendant, Grey Line Bus Company a/k/a The Gray Line, Inc. ("Grey Line"), unlawfully discriminated against him on the basis of his race in failing to hire him as a motor coach driver. The case was tried before Senior Judge Anthony Julian on February 16 and 17, 1982. At the stipulation of the parties, the Court received into evidence the transcript of additional testimony which had been presented to the Massachusetts Commission Against Discrimination (MCAD). Following Judge Julian's death on January 18, 1984, the case was transferred to Chief Judge Andrew A. Caffrey.

### I. *Facts*

On December 10, 1973, plaintiff Townsend went to defendant's offices in Roxbury, Massachusetts, and completed an application for the position of motor coach driver. Townsend had learned that the company was looking for drivers. At that time, Grey Line employed 53 motor coach drivers, none of whom was black.

Townsend was interviewed on January 16, 1974, by defendant's vice president, Patricia Galton. Ms. Galton told plaintiff about the position's rate of pay, the medical benefits which the company offered, and other job-related matters. She explained that, before being hired, plaintiff would have to take both a written examination and a road test, undergo a physical examination, and apply for a special driver's license issued by the Department of Public Utilities (DPU). Galton also reviewed plaintiff's employment history. Townsend had had considerable experience driving both gasoline powered school buses and diesel powered tractor trailers, but he had never before driven diesel powered motor coaches, which were the kind of vehicles used by Grey Line.

After speaking with Ms. Galton, plaintiff took both the written examination and the road test. He received a score of 90% on the written examination. Defendant's Director of Safety, Robert O'Connell then prepared to give plaintiff his road test. Before doing so, O'Connell asked Townsend to sign a document entitled "Certification of Road Test." This form had not yet been filled out when plaintiff signed it.

O'Connell then led Townsend and another applicant, Jean Beaulieu, to the bus which was to be used for the test. This bus had mechanical problems and was at the garage awaiting repair. After O'Connell started the bus, he was unable to get it into reverse and had to ask the driver of the bus for help. O'Connell told Beaulieu and Townsend that the clutch needed adjustment, and therefore, they would have to "snatch" it, or yank it, into gear.

Beaulieu took the driver's seat first. He had difficulty getting the bus in gear. Following O'Connell's directions, he drove about three miles. O'Connell then asked Beaulieu to pull over, and plaintiff took the wheel. Plaintiff also had trouble changing

gears. Other than giving directions, O'Connell said nothing to plaintiff while he was driving. After plaintiff had proceeded about one and one-half miles, the bus stalled in an intersection. Neither of the applicants nor O'Connell could revive the disabled vehicle. O'Connell then decided to walk to defendant's garage to get help. While he was gone, Townsend and Beaulieu succeeded in starting the bus, and Beaulieu drove it back to the garage.

O'Connell did not show the applicants their test results or tell them whether they had passed. He did inform plaintiff that the company would contact him, and that he should speak to Patricia Galton before he went home. Plaintiff discovered, however, that Galton had already left for the day.

Townsend returned to see Ms. Galton on Friday, January 18. At that time, she gave him both an application for a DPU license and a form for a physical examination which was to be given by a local doctor whom the company engaged. Plaintiff immediately filled out the application for the license, underwent the physical examination, and returned the completed documents to Ms. Galton the same day he had received them. Galton then asked plaintiff to come back the following Monday and see George Sullivan, the dispatcher, who would tell plaintiff with which driver he would be working.

On Monday, January 21, plaintiff met the dispatcher and explained the purpose of his visit. The dispatcher stated that he did not "know anything about it." He suggested that plaintiff go back and see Ms. Galton. Because she was unavailable, Townsend spoke instead to defendant's receptionist, Barbara Alexander. Ms. Alexander asked plaintiff if he had received a letter from the company. When he replied that he had not, she told him to go home and wait for the company to contact him. Plaintiff subsequently received from Vice-President Galton a letter which stated: "[a]fter examination of the results of your road test, we find that you do not qualify for hire as a Gray Line Bus Driver."

On January 22, 1974, plaintiff filed a charge of discrimination against Grey Line with the MCAD. He then filed a similar complaint with the EEOC. At plaintiff's request, the MCAD proceedings were transferred to the EEOC, which issued Townsend a Notice of Right to Sue on May 10, 1977. Plaintiff instituted the present action on July 1, 1977.

## II. *Statute of Limitations*

■ The first issue confronting this Court is the timeliness of plaintiff's suit, which he brings under both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. In order to maintain a Title VII action, a potential plaintiff must first file a discrimination charge with the EEOC within 180 days of the date on which the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e–5(e). If, after investigating the charge, the EEOC issues the person a Notice of Right to Sue, he or she must institute legal action within 90 days of receiving the Notice. 42 U.S.C. § 2000e–5(f)(1). Plaintiff has plainly met these statutory deadlines. He lodged a complaint with the EEOC immediately after learning that Grey Line had rejected his application for employment. He subsequently filed this action less than two months after being notified of his right to sue.

■ Plaintiff, however, fares less well with regard to the timeliness of his § 1981 claim. Because the Civil Rights Act of 1870 does not contain a statute of limitations, the appropriate time period is established by the particular state law which is most analogous to § 1981. *Johnson v. Railway Express Agency*, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975). It is well settled that the Massachusetts statute which supplies the controlling time contraint is M.G.L. c. 151B, whose limitation period is six months. M.G.L. c. 151B, § 5. *See Davis v. Sears, Roebuck & Co.*, 708 F.2d 862, 865 (1st Cir.1983). This interval runs from the date of the alleged discrimination and is not tolled by the filing of administrative proceedings under Title

VII. *Johnson v. Railway Express Agency,* 421 U.S. at 465–66, 95 S.Ct. at 1722–23; *Holden v. Comm'n Against Discrimination,* 671 F.2d 30, 34 (1st Cir.1982); *Davis v. Sears, Roebuck & Co.,* 708 F.2d at 865. Because I find that plaintiff's cause of action arose in January, 1974, and that plaintiff did not bring suit until July, 1977, I rule that plaintiff's claim under 42 U.S.C. § 1981 is barred by the statute of limitations.

### III. *Plaintiff's Title VII claim*

■ In order to succeed in a Title VII action, the plaintiff must ultimately persuade the trier of fact that "an employment decision was based on a discriminatory criterion illegal under the Act." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). Although the plaintiff's method of proof may vary from case to case, *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), the United States Supreme Court has suggested a three part analysis as a "sensible, orderly way to evaluate the evidence ... as it bears on the critical question of discrimination." *Id.* According to the Supreme Court's analytical framework, set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the plaintiff may establish a prima facie case of illegal discrimination by showing (i) that he is a member of a racial minority; (ii) that he was a qualified applicant for a position for which there was a vacancy; (iii) that he was rejected for this position; and (iv) that, after his rejection, the employer continued to seek applicants with qualifications similar to plaintiff's. *Id.* The defendant employer may rebut plaintiff's prima facie case merely by articulating some legitimate, nondiscriminatory reason for the plaintiff's rejection. *Id.* Although defendant's explanation of its reasons must be clear and specific, *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981), defendant need not prove that it was actually motivated by

these reasons. *Id.* at 254, 101 S.Ct. at 1094. Once the employer has provided a logical explanation for plaintiff's rejection, plaintiff must then be given an opportunity to show either that an unlawful discriminatory motive more likely prompted defendant's actions, or that defendant's proffered reasons are "unworthy of credence." *Burdine* at 256, 101 S.Ct. at 1095.

■ Applying this analysis to plaintiff Townsend's claim, I rule that plaintiff has succeeded in establishing a prima facie case of discrimination. Defendant admits that it was seeking motor coach drivers at the time plaintiff applied for a job, and that after the company rejected plaintiff, it proceeded to hire other drivers. Stipulation, ¶ 18. Furthermore, defendant's Director of Safety, Robert O'Connell, testified that Grey Line did not receive enough applications from experienced motor coach drivers to meet its needs, and therefore, it accepted applications from individuals, like plaintiff, who only had experience driving trucks or school buses. O'Connell further testified that the company hired such applicants if they proved to be capable drivers. This testimony indicates that, after rejecting Townsend, Grey Line continued to seek applicants with driving experience similar to his.

Grey Line rebuts Townsend's prima facie case by stating that "[p]laintiff was denied employment .... for the sole reason that [p]laintiff was unqualified for the position for which he applied." Answer, ¶ 20. Defendant does not make clear whether it considered plaintiff unqualified because he failed his road test, as the letter of rejection which the company sent him indicates, or because he had no experience driving diesel powered motor coaches. Either reason, however, would be sufficient grounds for refusing to hire plaintiff if that reason were defendant's true motivation.

■ Despite the legitimacy of defendant's proffered explanations, I find that these reasons are "unworthy of credence." *Burdine* at 256, 101 S.Ct. at 1095. I reject defendant's allegation that plaintiff was de-

nied employment because he lacked sufficient driving experience. Plaintiff testified that defendant's vice president, Patricia Galton, reviewed his employment history during his initial interview and gave no indication that she found it deficient. Plaintiff's testimony is buttressed by Robert O'Connell's statement, discussed above, that lack of experience driving motor coaches was no bar to employment by Grey Line.

I also reject defendant's contention that plaintiff failed his road test. O'Connell, who supervised plaintiff's road test, signed a document entitled "Certification of Road Test" which stated: "It is my considered opinion that this driver possesses sufficient driving skill to operate safely the type of commercial motor vehicle listed above," namely, a coach. In light of the significance of this certificate and the simplicity of completing it, I give no credence to O'Connell's testimony that, in order to save time, he routinely filled out and signed such certificates while applicants were taking their written examinations, and that he then retained the certificate of any applicant who subsequently failed the road test. O'Connell's contentions concerning this procedure are further undermined by plaintiff's testimony that the certificate had not yet been filled out when plaintiff signed it prior to taking his road test.

In addition, I give no weight to the document entitled "Record of Road Test," a preprinted evaluation form on which O'Connell allegedly checked off specific deficiencies in plaintiff's driving performance. Plaintiff introduced evidence rendering the authenticity of the markings on this document highly questionable.

The conditions under which the road test was given do nothing to engender confidence in either the test's alleged results or the validity of defendant's contentions concerning plaintiff's poor driving skills. The test was performed in a mechanically defective bus whose gears did not function properly. The examiner himself was unable to get the bus into reverse or to get it started after it unexpectedly stalled in an intersection for no apparent reason. Although the document entitled "Certification of Road Test" states that plaintiff's examination consisted of "approximately 15 miles of driving," plaintiff offered uncontroverted testimony that he drove the bus no more than one and one-half miles.

The actions of Vice President Galton also indicate that plaintiff passed his road test and qualified for hire by Grey Line. Plaintiff went to see Ms. Galton two days after taking the road test. At that time, Galton gave plaintiff both an application for a DPU license and a physical examination form which was to be completed by a physician with whom defendant did business. O'Connell testified that it was "highly unlikely" that Galton would have asked plaintiff to undergo a physical examination at the company's expense if she had been aware that plaintiff had failed his road test. Moreover, plaintiff offered uncontroverted testimony that, when he returned the completed documents to Galton, she instructed him to report to the dispatcher, who was to tell plaintiff which driver he would be accompanying.

Finally, I give no weight to the contents of defendant's letter to Townsend indicating that he was rejected because of his poor performance on the road test. Plaintiff proved that defendant sent a letter bearing an identical message to Jean Beaulieu, whom, defendant admits, the company rejected solely because an investigation of his previous employment revealed that he had been involved in a collision while driving a motor coach.

For the reasons set forth above, I rule that plaintiff has proved that defendant discriminated against him on the basis of his race, in violation of 42 U.S.C. § 2000e et seq., as amended.

## IV. Damages

The parties stipulated to the earnings of certain Grey Line coach drivers from 1974 to 1982. Stipulation, ¶ 5, 6. Extrapolating from these figures, plaintiff demonstrated that, had he been hired by Grey Line, he would have been paid $145,492.53 from

January, 1974, until the date of trial. Over the course of this eight year period, plaintiff earned $62,920.00, and he received an additional $6,900.00 in unemployment compensation.

 In calculating the amount of plaintiff's recovery, Townsend's earned income must be subtracted from the total sum which Grey Line would have paid him. 42 U.S.C. § 2000e–5(g). Courts, however, have differed about whether unemployment compensation should also be deducted from an award of back pay under Title VII. *Compare Abron v. Black & Decker Mfg. Co.,* 439 F.Supp. 1095, 1115 (D.Md.1977) (unemployment compensation is not deductible) *with EEOC v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919, 924 (S.D.N.Y.1976), *aff'd without opinion,* 559 F.2d 1203 (2nd Cir.1977) (unemployment compensation should be·deducted). The better view of the matter, and that which has been adopted in this District and elsewhere, is that the recovery of back pay under Title VII is an equitable remedy intended primarily to make the victim of discrimination whole. *Thurber v. Jack Reilly's, Inc.,* 521 F.Supp. 238, 242–43 (D.Mass.1981); *EEOC v. Enterprise Ass'n Steamfitters Local 638,* 542 F.2d 579, 592 (2nd Cir.1976).

In this case, no double recovery is necessary to compensate plaintiff for defendant's wrongdoing, nor is an incrementally larger award likely to deter defendant from engaging in unlawful hiring practices in the future. Therefore, I rule that plaintiff's unemployment compensation should be deducted from his back pay award.

### V. *Defendant's Default*

As a separate and independent basis for my decision in this case, I rule that defendant should be defaulted for failure to comply with the orders of this Court. Defendant failed to file suggested findings of fact and conclusions of law as ordered by Judge Julian in his memorandum and order of February 23, 1982. Furthermore, an examination of the docket for this case reveals that, on several occasions, defendant demonstrated great reluctance to par-ticipate in this litigation and did so only at the coercion of the Court.

The damages which plaintiff is entitled to receive on the basis of defendant's default are the same as those, discussed above, which result from defendant's liability for illegal employment discrimination.

Order accordingly.

### ORDER

It is ordered:

1. Judgment for plaintiff against the defendant Grey Line Bus Co., a/k/a The Gray Line, Inc. in the amount of $76,672.53.

2. Judgment for defendant Amalgamated Transit Union Local No. 1463.