James L. TOWNSEND,
Plaintiff, Appellee,

v.

GRAY LINE BUS CO., a/k/a the Gray
Line, Inc., Defendant, Appellant.

No. 85–1225.

United States Court of Appeals,
First Circuit.

July 12, 1985.

M. Robert Dushman, Boston, Mass., with whom David G. Stern, Barbara A. Lenk and Brown, Rudnick, Freed & Gesmer, Boston, Mass., were on brief, for defendant, appellant.

Richard L. Neumeier, Boston, Mass., with whom Parker, Coulter, Daley & White, Boston, Mass., was on brief, for plaintiff, appellee.

* Of the Federal Circuit, sitting by designation.

Before CAMPBELL, Chief Judge, BREYER and DAVIS,* Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Defendant Gray Line Bus Company ("Gray Line") appeals from a judgment awarding damages to plaintiff James L. Townsend. The United States District Court for the District of Massachusetts ruled that Gray Line had discriminated against Townsend because of his race in violation of Title VII and, in the alternative, that Gray Line was in default. Consolidated with this appeal is Gray Line's appeal from the order of the district court denying its motion for relief from judgment and for new trial.

Gray Line raises three points on appeal. First, it contends that when the original trial judge, Judge Julian, died after a bench trial without having filed findings of fact and conclusions of law, his successor, Chief Judge Caffrey, should have conducted a new trial. Instead, after Gray Line's counsel had failed to appear or contact the court, Chief Judge Caffrey decided the case on the basis of the record before Judge Julian. Gray Line contends that this procedure was so faulty as to entitle it to relief from judgment and a new trial. Second, Gray Line argues that even assuming Judge Caffrey could properly decide on the basis of the prior record, that record contained insufficient evidence to support a finding that Gray Line had discriminated against Townsend when it refused to hire him as a motor coach driver. Third, Gray Line denies that liability could be imposed, alternatively, on the theory of a default.

We hold that Gray Line waived its right to a new trial following Judge Julian's death, and that the court's finding that Gray Line discriminated against Townsend in violation of Title VII was adequately supported. We do not reach the question whether Gray Line could be held liable also on the theory that it had defaulted.

I.

On December 10, 1973, Townsend, who is black, went to Gray Line's offices and completed an application for the position of motor coach driver. At that time, Gray Line employed 53 motor coach drivers, none of whom were black although Gray Line was located in a predominantly black community with a black population in the entire area of approximately 18%. Gray Line recruited applicants in part by word of mouth and its employment application specifically required the applicant to identify the person who told him or her of the job opportunity.

Townsend's application was ultimately turned down—in Townsend's view because he was black, but according to Gray Line because he was not qualified. Resolution of the dispute turns on inferences to be drawn from events occurring between the time Townsend applied and the time, several weeks later, that he received a letter of rejection.

Before describing what transpired, it is relevant to summarize some of the evidence concerning Gray Line's hiring procedures. After an applicant filled out an application, Gray Line's Director of Safety, Robert V. O'Connell, would review it. Although the final decision to hire a driver remained with Gray Line Vice President Patricia Galton, O'Connell was authorized to reject applicants at this point if something on the application, e.g., lack of experience, indicated that the person was not qualified. O'Connell testified, however, that lack of experience driving motor coaches did not render an applicant unqualified; although the company preferred to hire applicants with motor coach driving experience, it would give persons with other driving experience, i.e., school bus or tractor trailer, "a shot at the road test" and the position because not enough experienced motor coach drivers applied due to Gray Line's low wages.

The applicant might then have a screening interview, after which O'Connell would administer a written examination and a road test. Two standardized forms reflected an applicant's road test performance. First, a "Certification of Road Test" form, on which O'Connell attested to the applicant's qualification to drive a motor coach, indicated that the applicant had passed the test. O'Connell testified that he would normally fill out this form in advance of the road test and would give it to the applicant if he passed but withhold it if he failed. Second, O'Connell would note specific driving deficiencies, make an evaluation of an applicant's general performance, and enter any general comments on a "Record of Road Test" form during the road test.

An applicant who was successful on the road test would be asked to undergo a physical examination by the company doctor at company expense, and to fill out an application for a Department of Public Utilities ("DPU") license. O'Connell noted that it was "very unlikely" that Galton would send someone who failed their road test for the physical examination because she was "pretty tight" with expenses.

If all went well to this point, Gray Line would check the applicant's record with previous employers, the Registry of Motor Vehicles, and the Board of Probation. An applicant with a clean bill from these sources would then be hired by Gray Line.

On January 16, 1974, Townsend was interviewed by Vice President Galton. Galton provided Townsend with general information about the position for which he had applied and advised him that before being hired, he would have to pass a written examination and a road test, and apply for a license to operate a motor coach from the DPU. Galton also obtained Townsend's employment history, which included jobs driving school buses and tractor trailers but none driving motor coaches. Apparently having found that Townsend's background qualified him for "a shot at the road test," Galton passed Townsend on to O'Connell.

O'Connell administered a written examination to Townsend and another applicant, Jean Beaulieu. Both men passed the examination. O'Connell then had the applicants

sign the company's standardized "Certification of Road Test" form in blank. The court below found that O'Connell (contrary to what he testified to have been his practice) did not himself complete the form prior to the test.

At this point, both applicants were led to the garage for their road tests. The bus that they were to drive had mechanical problems and was in the garage for repair. O'Connell started the bus but had difficulty getting it into reverse and had to have another Gray Line employee help him back it out of the garage and turn it around. O'Connell told Townsend and Beaulieu that the clutch needed adjustment and that they would have to "snatch," or yank, it into gear.

Beaulieu took the wheel first and had difficulty getting the bus into gear. After Beaulieu had driven without comment from O'Connell for about three miles, O'Connell asked him to pull over and let Townsend drive. Townsend drove, also without comment from O'Connell, for approximately 1½ miles when the bus "stalled out, completely stopped running, just cut off" in an intersection. None of the men, including O'Connell, could revive the bus so O'Connell began walking back to the garage for help. Beaulieu and Townsend finally got the bus started, caught up with O'Connell, and gave him a ride back to the garage.

O'Connell did not inform the applicants of the test results recorded on the "Record of Road Test" form or give them back the "Certification of Road Test" form. These forms were, however, later found in each man's file, signed and filled out by O'Connell. The "Certification of Road Test" forms, apparently completed after the administration of the test, read: "It is my considered opinion that this driver possesses sufficient driving skill to operate safely the type of commercial motor vehicle listed above."

On the separate "Record of Road Test" form, O'Connell had not checked off any specific driving deficiencies on Beaulieu's form, but he had checked the "Needs Training" portion of the "General Performance" evaluation and noted that Beaulieu had "General good knowledge but needs some familiarization."

There is a dispute as to what Townsend's road test form contained as two different documents were produced by Gray Line at different times. A copy of the "Record of Road Test" form that Gray Line submitted to the Equal Employment Opportunity Commission ("EEOC") contained only a check mark next to "Needs Training" in the "General Performance" evaluation section and the notation "needs extensive training." The Massachusetts Commission Against Discrimination ("MCAD"), however, was given a different document, also signed by O'Connell, that was alleged to be the original "Record of Road Test" form and that contained a more critical evaluation of Townsend's performance. Although the general comment, "needs extensive training," appears in the same spot and the same handwriting on this document, there were a number of check marks next to specific driving deficiencies that did not appear on the EEOC document, and there was a check next to "Unsatisfactory" as well as "Needs Training" in the "General Performance" evaluation.

O'Connell testified that he had no independent recollection of the results of Townsend's road test but, relying on the latter form and the fact that the "Certification" form had not been given to Townsend, O'Connell inferred that Townsend, in effect, flunked.[1] O'Connell could offer no explanation of how these two different documents could have been produced and assigned responsibility for the confusion on "whoever was keeping the records."

---

1. The district court gave "no credence" to O'Connell's testimony that he filled out and signed the "Certification of Road Test" forms in advance of administering the test, and that he retained the certification form of any applicant who failed. This rejection of O'Connell's story is supported by the court's findings that Townsend's and Beaulieu's certification forms were blank just prior to the road test and that Beaulieu had not failed the road test, see infra page 15, but had nevertheless not been given his certification form.

After returning to the garage, O'Connell told Townsend that Gray Line would contact him and that he should talk to Galton before he went home. Galton had left for the day, however, so Townsend went home and returned to see Galton on Friday, January 18. Although there was some dispute about when Townsend received an application for a DPU license and a form for a physical examination to be administered by the company doctor at company expense, the district court found and the record indicates that Galton gave Townsend these materials during this meeting, two days after Townsend's road test.

Townsend immediately filled out the DPU application and successfully underwent the physical examination. He returned the forms to Galton that same day. Galton then told him to come in the following Monday evening and see George, the dispatcher, who would tell Townsend what driver would be working with him during his break-in period. Townsend appeared for work on January 21, but George said that he had not heard anything about Townsend and referred him back to Galton. Townsend went back to the offices and, because Galton had already gone home, talked to the receptionist, Barbara Alexander. Alexander asked him if he had received a letter from Gray Line and, upon learning that he had not, told him to go home and wait for the company to contact him. Townsend received a letter from Galton dated January 29, 1974 advising him that "[a]fter examination of the results of your road test, we find that you do not qualify for hire as a Gray Line Bus Driver."

Beaulieu, who is white, also received a letter dated January 29, 1974 stating that "[a]fter examination of the results of your road test, we find that you do not qualify for hire as a Gray Line Bus Driver." However, it appears that this was not the true reason for Beaulieu's rejection, and, indeed, that up to a time well after the driving test, a decision to hire him was in effect. Thus, on Beaulieu's employment application was a notation stating "part time 1/22/74," indicating that a decision to hire him on a part-time basis had been made. The notation had been crossed out, and beneath it, the words "bad driving records" were inscribed. Beaulieu's employment papers indicated that his background check disclosed that he had had an accident in March 1973, which would have disqualified him from employment under Gray Line's policies. No such background check appears in Townsend's file.

It is uncontested that after Townsend was advised that he would not be hired, Gray Line hired other drivers, some of whom had negligible experience driving motor coaches.

## II.

On January 22, 1974 Townsend filed a charge of discrimination against Gray Line with MCAD in which he alleged that he had not been hired because of his race. Subsequently, Townsend filed a similar claim with the EEOC. MCAD waived jurisdiction of the complaint to the EEOC, which on February 25, 1977 found that there was "reasonable cause to believe the charge is true" and on May 10, 1977 issued a Notice of Right to Sue to Townsend. Townsend filed suit in the United States District Court for the District of Massachusetts on July 1, 1977.

MCAD, giving substantial weight to the EEOC's findings, attempted to "eliminate the unlawful discrimination by conference, conciliation and persuasion" pursuant to Mass.Gen.Laws c. 151B, § 5. On December 22, 1980 MCAD Commissioner Daniel O. Steele held a public hearing and took the testimony of a number of witnesses. Commissioner Steele retired before rendering a decision.

Meanwhile, Townsend's suit in district court was creeping slowly forward. Gray Line's first counsel, Abbott L. Reichlin, was responsive to Townsend's discovery requests and cooperated in moving the case forward. But on June 23, 1978, Reichlin withdrew as Gray Line's counsel, and Alan Caplan undertook the defense, at which point the case began to stall. Prior to

Judge Keeton's decision to disqualify himself on June 18, 1980, he entered sanctions against Gray Line at various times for its failure to respond to discovery requests in a timely fashion.[2]

On June 19, 1980, the case was assigned to Judge McNaught and counsel were notified. Townsend requested a default judgment on August 4, 1980 based on Caplan's failure to reply to requests for production as per order of the court. No action was taken on this motion.

Judge Julian was then assigned to the case and he asked the parties to appear for a trial assignment conference on December 1, 1981. Caplan called the deputy clerk at 3 p.m. on November 30 to say that he would be unable to attend. On December 1, 1981 Judge Julian defaulted Gray Line for its failure to appear at the conference. Subsequently, Caplan applied to Judge Julian to remove the default and the application was granted on February 9, 1982. The case was sent down for trial starting February 16, 1982.

The nonjury trial commenced on February 16 before Judge Julian. The parties stipulated that the transcript of a number of witnesses' testimony before Commissioner Steele on December 22, 1980 would be admitted into evidence. In addition, Townsend, Steven Kaplan (Gray Line's owner), and Michael Low (Gray Line's expert on driving) testified in person. At the close of trial, the attorneys for both sides requested, and Judge Julian ordered, that the parties submit suggested findings of fact and conclusions of law in lieu of closing argument according to a schedule the court was to set out.

On March 8, 1982, Townsend filed his suggested findings of fact and conclusions of law pursuant to the court's order. Gray Line was to file its proposed findings and conclusions 14 days after receiving the

same from Townsend, which, allowing three days for mailing, would have required their receipt by March 25, 1982. On March 31, 1982 the deputy clerk of the district court telephoned Caplan to inquire when Gray Line intended to submit these materials and Caplan promised him to have them in by April 5, 1982. Failing to receive the papers, the clerk attempted to contact Caplan again on May 4 and May 28 without success. Townsend's attorney also wrote to the court on June 17 and September 27, 1983 noting that he had not received Gray Line's findings and conclusions and asking about the status of the case. Copies of both letters were mailed to Caplan but elicited no action from him. Indeed, from then to now Caplan took no further action of any kind in the case on behalf of Gray Line.

The case was transferred to Chief Judge Caffrey and counsel were notified on December 29, 1983, three weeks before Judge Julian died. Prior to his death, Judge Julian had not filed his findings of fact and conclusions of law, nor had he entered judgment for either party. On January 6, 1984, Chief Judge Caffrey sent notice to counsel, including Gray Line's counsel, Mr. Caplan, that a conference was scheduled for January 27, 1984 and that "[f]ailure to appear may result in default or dismissal." Counsel for Townsend appeared at the status conference but no one attended for Gray Line nor did Caplan or any other representative of Gray Line contact the court in response to notice of the status conference. Chief Judge Caffrey stated at the conference that he might decide the case based on the trial transcript and exhibits on file and that Gray Line's failure to file anything after being directed by Judge Julian to do so amounted to waiver of any right to a new trial.

---

**2.** On June 28, 1979, the court issued a notice of delinquency for Gray Line's failure to respond to Townsend's second set of interrogatories. On July 26, 1979, the court allowed Townsend's uncontested motions (1) for sanctions for Gray Line's repeated failure to make O'Connell available for scheduled depositions and (2) to compel production of documents previously requested. On August 15, 1979 the court allowed Townsend's motion to compel answers to the interrogatories that were the subject of the June 28 notice of delinquency and ordered Gray Line to comply within 28 days (they were finally received April 4, 1980, eight months later).

On September 28, 1984 Townsend's counsel wrote a letter to the district court clerk, sending copies to both of Caplan's known addresses, detailing his understanding of the status of the case. He specifically noted that "[o]n Friday, January 27, 1984, I appeared before the Court in response to a notice by you dated January 6, 1984 and at that time Chief Judge Caffrey suggested that he render a decision based upon the transcript of the evidence, exhibits on file, etc." Neither Caplan nor anyone else on Gray Line's behalf responded to this letter or objected to the plans mentioned in it to render a decision based upon the transcript.

On November 27, 1984, Chief Judge Caffrey found for Townsend on the merits and, in the alternative, defaulted Gray Line for failure to comply with orders of the court, 597 F.Supp. 1287.

Final judgment awarding damages of $76,672.53 against Gray Line was entered on January 3, 1985. At this point, Townsend attempted to execute the judgment. Although notice of each prior action had been mailed to Caplan, who was Gray Line's attorney of record, Gray Line claimed that the writ of first execution dated February 15, 1985 was the first notice it had of the adverse judgment. On March 1, 1985 Gray Line filed a Motion to Extend Time for Filing Notice of Appeal, which was allowed on March 4, 1985. A Notice of Appeal was filed shortly thereafter. Additionally, Gray Line filed a Motion for Relief from Judgment and for New Trial pursuant to Fed.R.Civ.P. 60(b), which was denied. Gray Line then filed a Notice of Appeal from the order denying its rule 60(b) motion, and by stipulation the appeals were consolidated.

### III.

We first address Gray Line's claim that Judge Caffrey erred in deciding the case on the basis of the record before Judge Julian rather than by conducting a new trial.

Rule 63 of the Federal Rules of Civil Procedure provides

Disability of a Judge

If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules *after a verdict is returned or findings of fact and conclusions of law are filed,* then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.

(Emphasis added).

Rule 63 does not explicitly cover instances where, as here, the presiding judge in a bench trial dies or becomes disabled *before* he can file his findings of fact and conclusions of law. Courts, however, have read into rule 63 the negative inference that if the presiding judge in a civil case [3] dies or becomes disabled before the rendering of a verdict or before the judge issues his findings of fact and conclusions of law, a successor judge must retry the case. *See Whalen v. Ford Motor Credit Co.,* 684 F.2d 272 (4th Cir.1982) (en banc); *Thompson v. Sawyer,* 678 F.2d 257 (D.C.Cir.1982); *Arrow-Hart, Inc. v. Philip Carey Co.,* 552 F.2d 711 (6th Cir.1977); *Ten-O-Win Amusement Co. v. Casino Theatre,* 2 F.R.D. 242 (N.D.Ca.1942); C. Wright & A. Miller, 11 *Federal Practice and Procedure* § 2922, at 340–41 (1973). *Cf. Brennan v. Grisso,* 198 F.2d 532 (D.C.Cir.1952). An exception to the rule mandating a retrial is normally made only if all parties agree to allow the successor judge to proceed with an ongoing jury trial or, in a nonjury action, to make findings of fact and conclusions of law based on a prior, or stipulated, record. *See Milbrew, Inc. v. Commissioner of Internal Revenue,* 710 F.2d 1302,

---

**3.** In a criminal case, *Fed.R.Crim.P.* 25(a) specifically provides that if a judge becomes disabled or dies after a jury trial has commenced, another judge of that court, upon certifying that he has familiarized himself with the record of the trial, may proceed with and finish the trial.

1308 (7th Cir.1983); *Whalen*, 684 F.2d at 278; *Thompson*, 678 F.2d at 268–69; *Arrow-Hart, Inc.*, 552 F.2d at 712–13; *Morton v. Ortho Pharmaceutical Corp.*, 550 F.Supp. 416, 417 (E.D.Tenn.1982); *Stoltzfus v. United States*, 264 F.Supp. 824, 826 (E.D.Pa.1967), *aff'd*, 398 F.2d 1002, 1003 n. 2 (3d Cir.1968), *cert. denied*, 393 U.S. 1020, 89 S.Ct. 627, 21 L.Ed.2d 565 (1969).

█ We agree with Gray Line that constitutional considerations, as well as the implication of rule 63, require that a new trial ordinarily be accorded to litigants in cases where a previous judge dies or becomes disabled before filing his findings and rulings. Thus, but for the conduct of Gray Line, the case should have been re-tried. Here, however, we are satisfied that Gray Line waived its right to a new trial by failing to appear at the status conference, by failing to respond when Townsend's counsel later notified it that the court would likely proceed on the basis of the old record, and by neglecting to respond or communicate with the court in any way during the relevant period.

Gray Line's attorney, Mr. Caplan, was notified that Gray Line's case had been transferred to a new judge,[4] a fact that should have alerted him that the question of how the new judge would proceed in deciding the case had necessarily arisen. Thereafter, Mr. Caplan was given three weeks' advance notice that his presence was required at a status conference. It took no peculiar insight to divine that the purpose of the conference was to determine the manner in which the new judge would proceed following Judge Julian's death. Despite this, and the warning in the notice

that failure to appear could result in default, Mr. Caplan failed either to appear or to contact the court. Eight months later, Townsend's counsel set out in a letter to the Clerk its understanding that Chief Judge Caffrey contemplated deciding the case on the transcript and exhibits from prior proceedings. It sent copies to Mr. Caplan at his two addresses. In the month between the date of this notice and the Chief Judge's decision of the case, neither Caplan nor anyone else acting for Gray Line objected to this procedure or communicated with the court regarding the case. Only after execution had issued upon an adverse judgment did Gray Line convey its displeasure and demand a retrial. If we assume, as we do, that notice to Caplan was notice to Gray Line, it is clear that Gray Line had no right to sit back and await decision of the case before objecting to the procedure. *See, e.g., Computer Systems Engineering, Inc. v. Qantel Corp.*, 740 F.2d 59, 69 (1st Cir.1984) (failure to object to improper closing argument at trial or to move for mistrial bars defendant from urging improper argument as grounds for new trial after verdict returned) (" 'a party may not wait and see whether the verdict is favorable before deciding to object' "); *American Universal Co. v. Falzone*, 644 F.2d 65, 67 (1st Cir. 1981) (appellant's withdrawn motion for mistrial based on alleged improper jury argument may not be raised on appeal after adverse jury verdict).

We think the district court was entitled to infer from Gray Line's silence that Gray Line acquiesced in the procedure it adopted and had waived its right to retry the case.[5]

---

4. Gray Line's derelictions prior to Judge Julian's death and Chief Judge Caffrey's assumption of the case do not, of course, bear directly on the waiver issue here. Nonetheless, Gray Line's sorry record of unresponsiveness and delay were factors Chief Judge Caffrey could legitimately consider in determining whether further efforts to prod Mr. Caplan into action were warranted.

5. We note in passing that it is questionable to what extent, if any, Chief Judge Caffrey's decision to try the case on the prior record worsened Gray Line's position. In the trial before

Judge Julian, the transcripts of a number of witnesses' testimony before Commissioner Steele were admitted into evidence by stipulation. Only three live witnesses were called. Gray Line asserts that an evaluation of the credibility of one of these witnesses, Townsend, is crucial to the determination of this case. But this may not be so. The crux of this case is whether Townsend was actually determined to be unqualified to drive a motor coach for Gray Line. O'Connell's testimony regarding the qualifications Gray Line found necessary for a motor coach driver and Gray Line's hiring proce-

■ Gray Line attempts to avoid responsibility for the conduct we have deemed to constitute waiver by pointing to its attorney, Caplan, as the sole villain of the piece. We do not credit Gray Line's claims of total innocence. With any kind of diligence, Gray Line should have been aware of Caplan's failings at least by the time Judge Julian defaulted it, if not before. Gray Line knew, moreover, that Caplan had moved to California from Boston, but it took no effective steps to reach a fuller understanding with him or to replace him. There is no indication that Gray Line attempted to contact Caplan during the three years between trial and execution to ask about the status of the case or to prod him into action. Even if, as Gray Line claims, Caplan assured it that all possible had been done and that there might be a lengthy period of time before the case was decided, Gray Line's failure to make sufficient inquiry of its attorney over a three year period constitutes a serious neglect.

We find no reason to make any exception to this circuit's longstanding rule with regard to the responsibility of clients for their attorney's acts or omissions. As we stated in *Damiani v. Rhode Island Hospital*, 704 F.2d 12 (1st Cir.1983)(upholding dismissal of action for failure to comply with discovery order),

The argument that the sins of the attorney should not be visited on the client is a seductive one, but its siren call is overborne by the nature of the adversary system.

There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose the attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each par-

ty is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney." *Smith v. Ayer*, 101 U.S. 320, 326 [11 Otto 320, 326], 25 L.Ed. 955.

*Link v. Wabash Railroad Co.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962) (footnote omitted). As Justice Harlan points out in the footnote to the above quote, keeping a suit alive "merely because plaintiff should not be penalized for the omissions of his own attorney would be visiting the sins of the plaintiff's lawyer upon the *defendant.*" *Id.* at 634 n. 10, 82 S.Ct. at 1390 n. 10. We have also turned a deaf ear to this plea. *Corchado v. Puerto Rico Marine Management, Inc.*, 665 F.2d 410, 413 (1st Cir.1981), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *Pease v. Peters*, 550 F.2d 698, 701 (1st Cir.1977).

*Id.* at 16–17.

### IV.

■ Gray Line next attacks the district court's decision on the merits. A plaintiff may establish a prima facie case of illegal discrimination by showing (1) that he is a member of a racial minority; (2) that he was a qualified applicant for a position for which there was a vacancy; (3) that he was rejected for the position; and (4) that, after plaintiff's rejection, the employer continued to seek applicants with qualifications similar to plaintiff's. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The plaintiff's prima facie case is rebutted if the employer "articulate[s] lawful reasons for the action." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 257, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). Once the employer articulates a lawful reason, the plaintiff must have the opportunity to show that the proffered reason was not the true reason for the employment decision.

dures, was arguably the most important evidence in the case but it had been admitted in

the prior trial, with Gray Line's consent, in transcript form.

This burden now merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.[6]

*Id.* at 256, 101 S.Ct. at 1095. *See also McDonnell Douglas,* 411 U.S. at 804–805, 93 S.Ct. at 1825–1826.

Gray Line asserts that the district court's finding that Townsend was qualified to be a motor coach driver was clearly erroneous. Although it seems to be challenging the court's finding of a prima facie case, Gray Line may also be seen as attacking the court's finding that Townsend met his ultimate burden by showing that Gray Line's asserted grounds for rejecting Townsend were not credible. Regardless of its analytical context, Gray Line's challenge has no merit.

█ If Gray Line is arguing that Townsend failed to establish his prima facie case because his lack of experience made him an unqualified candidate, we disagree. Galton did not advise Townsend of any deficiency in his experience after reviewing his background in the initial screening interview. Indeed, she sent Townsend on in the application process. Additionally, O'Connell stated that Gray Line did not regard the lack of motor coach driving experience as a bar to employment.

█ If Gray Line is arguing that the district court erred in finding Gray Line's "legitimate, nondiscriminatory" reason for not hiring Townsend (i.e., he failed his road test) not credible, we also must disagree. The court supportably inferred that O'Connell did not complete the "Certification of Road Test" form until after the test, at which time, with full knowledge of the results, he attested that Townsend was qualified to drive a motor coach.

Galton's actions after the test bolsters the district court's conclusion that Townsend had passed the road test. Galton had two days in which to find out the results before she met with Townsend. It is reasonable to assume, given her reputation for being very careful with company funds, that Galton would have assured herself that Townsend had passed the road test before she sent him for a physical at company expense and gave him a DPU license application. The court also supportably found that when Townsend returned from the doctor's examination, he was told to report to work on Monday. Certainly before notifying him to come in to work, Galton would have checked to see that he was qualified to drive.

Finally, the district court was supported in disregarding Gray Line's letter to Townsend indicating that he was rejected because he failed the road test by the fact that the company used an identical reason in a letter to Beaulieu, who was actually rejected on other grounds. Moreover, like Townsend's, Beaulieu's "Certification of Road Test" form, signed by O'Connell, was retained by Gray Line, indicating that its retention did not necessarily indicate the applicant had failed. See Note 1, *supra.*

In sum, we conclude that the finding that Townsend was a qualified applicant for purposes of establishing his prima facie case, and the conclusion that Gray Line's explanation that Townsend was not hired because he was not qualified was not credible, are sufficiently supported by the record, and we therefore affirm the judgment of the district court. Given our disposition of this issue, we need not address Gray Line's challenges to alternate, default, grounds for the judgment.

*Affirmed.*

---

6. Gray Line argues that the district court's application of Title VII law to these facts was erroneous inasmuch as the court held Gray Line liable because it found Gray Line's legitimate reasons for failing to hire Townsend "unworthy of credence." In view of the above quoted directive from the Court and this court's own precedent, *see Earnhardt v. Commonwealth of Puerto Rico,* 744 F.2d 1, 2 (1st Cir.1984) ("We agree with the district court that this proferred reason was not credible ..."), it is clear the district court's analysis was entirely proper.